

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-21-1997

# City of Erie v. Guaranty Natl Ins Co

Precedential or Non-Precedential:

Docket 96-3117,96-3163

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"City of Erie v. Guaranty Natl Ins Co" (1997). *1997 Decisions.* Paper 68.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/68

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 96-3117 & 96-3163
_____

CITY OF ERIE, PENNSYLVANIA

v.

GUARANTY NATIONAL INSURANCE COMPANY;
IMPERIAL CASUALTY AND INDEMNITY COMPANY;
WESTERN WORLD INSURANCE COMPANY

City of Erie,

Appellant

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil Action No. 95-cv-00090E)
_____

Argued October 30, 1996

Before:  SCIRICA and COWEN, Circuit Judges
and POLLAK, District Judge*

(Filed March 21, 1997)

GREGORY A. KARLE, ESQUIRE (ARGUED)
Office of the City Solicitor
Municipal Building
626 State Street, Room 505
Erie, Pennsylvania 16501

   Attorney for Appellant

_____
*The Honorable Louis H. Pollak, United States District Judge for
the Eastern District of Pennsylvania, sitting by designation.

1

GERALD J. STUBENHOFER, JR., ESQUIRE (ARGUED)
MARCIA H. HALLER, ESQUIRE
MacDonald, Illig, Jones & Britton
100 State Street, Suite 700
Erie, Pennsylvania 16507

   Attorneys for Appellee,
   Guaranty National Insurance Company


RICHARD P. JEFFRIES, ESQUIRE (ARGUED)
ROBERT M. SLOVEK, ESQUIRE
Kutak Rock
The Omaha Building
1650 Farnam Street
Omaha, Nebraska 68102-2186

   Attorneys for Appellee,
   Imperial Casualty and Indemnity Company


PAMELA G. COCHENOUR, ESQUIRE (ARGUED)
NORA BARRY FISCHER, ESQUIRE
Pietragallo, Bosick & Gordon
One Oxford Centre, 38th Floor
Pittsburgh, Pennsylvania 15219

   Attorneys for Appellee,
   Western World Insurance Company

---

OPINION OF THE COURT

---

SCIRICA, <u>Circuit</u> <u>Judge</u>.

The issue on appeal involves the interpretation of an "occurrence" insurance policy under Pennsylvania law, specifically whether the tort of malicious prosecution "occurs" when the criminal charges are filed or when the prosecution is resolved in the plaintiff's favor.

2

Louis DiNicola was arrested and charged on March 25, 1980, for arson and three counts of second degree murder. He was convicted on all counts. On December 6, 1983, the Pennsylvania Supreme Court overturned his conviction and remanded for a new trial. Commonwealth v. DiNicola, 468 A.2d 1078 (Pa. 1983). More than ten years later, on May 23, 1994, a jury acquitted DiNicola of all charges.

On December 15, 1994, DiNicola filed a complaint in federal court charging the City of Erie with, inter alia, malicious prosecution. He sought damages under federal and state law.[1] In order to assert a claim of malicious prosecution, a plaintiff must allege "the defendants instituted proceedings without probable cause, with malice, and that the proceedings were terminated in favor of the plaintiff." Cosmas v. Bloomingdales Bros., Inc., 660 A.2d 83, 85 (Pa. Super. 1995) (quoting Amicone v. Shoaf, 620 A.2d 1222, 1224 (Pa. Super. 1993)). It is undisputed that a plaintiff has no cause of action for malicious prosecution in Pennsylvania until dismissal or acquittal of the underlying criminal charges. The statute of limitations in Pennsylvania for malicious prosecution claims is two years. 42 Pa. Cons. Stat. Ann. § 5524; Seto v. Willits, 638 A.2d 258 (Pa. Super. 1994). It begins to run on the date when

---

1. His complaint sets forth federal claims under 42 U.S.C. §§ 1983 and 1988 as well as state law claims for "false arrest and imprisonment, malicious prosecution, spoilation of evidence, intentional infliction of emotional distress, defamation, abuse of process, willful misconduct, prima facie tort, conspiracy tort, negligence and gross negligence."

the underlying proceedings are terminated in the plaintiff's favor.  Cap v. K-Mart Discount Stores, Inc., 515 A.2d 52 (Pa. Super. 1986).

The City of Erie requested a defense and indemnification from its insurers, appellees Guaranty National Insurance Company, Imperial & Indemnity Company and Western World Insurance Company.  Each insurance company declined coverage on the ground that the alleged tort had not occurred during the periods covered by their respective policies with the city.[2]  The City of Erie then sought a declaratory judgment in the United States District Court for the Western District of Pennsylvania that the insurers were obligated to defend and indemnify it against DiNicola's action.[3]

The parties agree the insurance policies provide coverage for malicious prosecution suits and are "occurrence" policies, not "claims made" policies.[4]  "An 'occurrence' policy

2.    Each insurance company insured the City of Erie at various times from July l, 1980 to January l, 1995.  Guaranty insured the city from July 1, 1980 to January 1, 1984.  Imperial insured the city from January 1, 1984 to November 1, 1988.  Western World insured the city from November 1, 1988 to January 1, 1995.

3.    The City of Erie voluntarily dismissed its claims against two other  insurance companies, United National Insurance Company and Diamond State Insurance Company, in order to establish diversity jurisdiction.

4.    Guaranty's policies provide that Guaranty "will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay . . . for damage because of  . . . Personal Injury Liability . . . to which this insurance applies caused by an occurrence within the policy period. . . ."  Western World's policies provide: "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury', 'property damage' or 'personal injury' to which this insurance applies occurring during the policy period as a result of a 'law enforcement incident' that takes place in the

4

protects the policy holder from liability for any act done while the policy is in effect, whereas a 'claims made' policy protects the holder only against claims made during the life of the policy." St. Paul Fire & Marine Ins. Co. v. Barry, 438 U.S. 531, 535 n.3 (1978). Nor are the time periods covered by the policies in dispute. But the parties disagree whether the tort of malicious prosecution occurred, for insurance coverage purposes, during the periods covered by these policies.

Guaranty National and Western World moved to dismiss the case under Fed. R. Civ. P. 12(b)(6), asserting the tort did not occur during the periods covered by their policies. They argued the tort of malicious prosecution "occurs" for insurance coverage purposes at the time the underlying criminal charges are filed against the plaintiff. Because the murder and arson charges against DiNicola were filed on March 25, 1980, when none of their policies was in effect, they claimed there was no coverage. In response, the City of Erie contended the tort of malicious prosecution "occurs" when the claim arises -- in this case, in 1994, when DiNicola was acquitted and when he was first able to bring suit under Pennsylvania law. In the alternative, the City argued for application of a "multiple trigger" analysis similar to that employed by Pennsylvania courts in asbestosis cases. Under a multiple trigger theory, all three insurers could

(..continued)
coverage territory." Imperial's policies provide: "This policy applies only to acts committed or alleged to have been committed during the policy period stated in the declarations."

5

be responsible to some degree to defend and indemnify the City of Erie against DiNicola's suit.

The district court held the insurance contracts were "occurrence policies" and that the tort of malicious prosecution "occurs" when the underlying charges are filed. Erie v. Guaranty Nat'l Ins. Co., 935 F. Supp. 610 (W.D. Pa. 1996). Because the underlying charges were filed against DiNicola on March 25, 1980 and none of the insurance policies were in force on that date, the court dismissed the claims against Western World and Guaranty National. Subsequently, Imperial was granted summary judgment on the same grounds. The City of Erie now appeals.

## II.

The district court had diversity jurisdiction over this declaratory judgment action under 28 U.S.C. § 1332. We have jurisdiction under 28 U.S.C. § 1291.

Our review of the district court's dismissal of the complaint under Fed. R. Civ. P. 12(b)(6) is plenary. We must determine whether, under any reasonable reading of the pleadings, the plaintiff may be entitled to relief. We must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom. Nami v. Fauver, 82 F.3d 63 (3d Cir. 1996). Our review of the district court's grant of summary judgment is plenary. United States v. Capital Blue Cross, 992 F.2d 1270 (3d Cir. 1993). We apply the same test the district court should have used originally. Summary judgment should be sustained only if there is no genuine issue of material

6

fact and the moving party is entitled to judgment as a matter of law.

## III.

### A.

Under Pennsylvania law, the general rule is that a tort "occurs" for insurance coverage purposes when the injuries caused by the tort first become apparent or manifest themselves. In the case of malicious prosecution, it is undisputed that the injuries caused by the tort first manifest themselves at the time the underlying criminal charges are filed.

Had the City of Erie purchased an occurrence policy in effect on March 25, 1980, when the charges against DiNicola were filed, the City would be covered. Likewise, had the City of Erie obtained a "claims made" insurance policy in effect on December 15, 1994, it would be covered. But as we have noted, all of the insurance policies here were occurrence policies, and none were in effect at the time DiNicola's injury first manifested itself.

### B.

The Pennsylvania Supreme Court has not decided when, for insurance coverage purposes, the tort of malicious prosecution occurs. As a federal court sitting in diversity, we must predict what the Pennsylvania Supreme Court would do. In making this determination, we give proper regard to the opinions of Pennsylvania's intermediate courts. The policies underlying applicable legal doctrine, current trends in the law and

7

decisions of other courts also inform our decision.  Wassall v. DeCaro, 91 F.3d 443, 445 (3d Cir. 1996).

Even though the Pennsylvania courts have not addressed this precise question, other courts have done so.  Although there is no agreement on when the tort of malicious prosecution occurs for insurance coverage purposes, the clear majority of courts have held the tort occurs when the underlying criminal charges are filed.  Royal Indem. Co. v. Werner, 979 F.2d 1299 (8th Cir. 1992) (applying Missouri law); Southern Maryland Agric. Ass'n, Inc. v. Bituminous Cas. Corp., 539 F. Supp. 1295 (D. Md. 1982) (applying Maryland law); Ethicon, Inc. v. Aetna Cas. and Sur. Co., 688 F. Supp. 119 (S.D.N.Y. 1988) (applying New Jersey law); S. Freedman & Sons, Inc. v. Hartford Fire Ins. Co., 396 A.2d 195 (D.C. 1978); American Family Mut. Ins. Co. v. McMullin, 869 S.W.2d 862 (Mo. Ct. App. 1994); Patterson Tallow Co., Inc. v. Royal Globe Ins. Companies, 444 A.2d 579 (N.J. 1982); Muller Fuel Oil Co. v. Ins. Co. of North America, 232 A.2d 168 (N.J. Super., App. Div. 1967); Harbor Ins. Co. v. Cent. Nat'l Ins. Co., 211 Cal. Rptr. 902 (Cal. App. 1985); Zurich Ins. Co. v. Peterson, 232 Cal. Rptr. 807 (Cal. App. 1986).  But two courts have held the tort of malicious prosecution occurs on the date when the plaintiff receives a favorable termination of the underlying proceeding and his claim for malicious prosecution arises.  Roess v. St. Paul Fire and Marine Ins. Co., 383 F. Supp. 1231 (M.D. Fla. 1974) (applying Florida law); Security Mut. Cas. Co. v. Harbor Ins. Co., 382 N.E.2d 1 (Ill. App. 1978), rev'd on other grounds, 397 N.E.2d 839 (Ill. 1979).

8

**1.**

Courts adopting the majority rule have cited two major principles to explain why the tort of malicious prosecution occurs at the time the criminal charges are filed.[5]  One common theme is that the "essence", "gist", or "focus" of malicious prosecution is the filing of the underlying charges.  Favorable termination of the criminal action is merely a "condition precedent" to bringing the action.  See, e.g., Muller, 232 A.2d at 174-75 ("essence of tort" is making of criminal charge; favorable termination is "condition precedent"); Freedman, 396 A.2d at 199 (filing of charges is "gist" and "crucial point" of tort); Harbor Ins. Co., 211 Cal. Rptr. at 907 (element of favorable termination "is not part of the wrong", but a "precondition for the cause of action"; "focus" and "gist" of wrong is institution of underlying suit); American Family Mut. Ins. Co. v. McMullin, 869 S.W.2d at 864 ("focus" of tort is the institution of the underlying suit; quoting Harbor Ins. Co, 211 Cal. Rptr. at 907).

The other theme is that reliance on the "time of favorable termination" to trigger liability has unwise policy implications, for it allows tortfeasors with information about their own potential liability to shift the burden to unwary

---

5.    In addition, some courts have held the terms of the specific insurance policies have evidenced the parties' intent to adopt the majority rule.  See Royal Indemnity, 979 F.2d at 1300; Patterson Tallow, 444 A.2d at 585 n.5; Harbor Insurance, 211 Cal. Rptr. at 906.  We see no clear intent in the language of the policies in this appeal favoring either the majority or minority position.

insurance companies.  As the Court of Appeals for the Eighth Circuit noted, " ... a contrary rule might well enable plaintiffs to lull an unwary insurer into extending coverage after they perceive an impending difficulty from a suit in which they are already engaged."  Royal Indemnity, 979 F.2d at 1300.  See also Royal Indem. Co. v. Werner, 784 F. Supp. 690, 692 (E.D. Mo. 1992) ("Under this interpretation an individual who sees that his lawsuit may spawn a malicious prosecution claim cannot purchase insurance and shift his obligation to an unwary insurer."); Harbor Insurance Co., 211 Cal. Rptr. at 910 (Under minority rule, "tortfeasor could purchase a policy such as this after committing the tort and thereby enjoy excess coverage for its yet-to-be unfolded consequences."); Muller, 232 A.2d at 175 ("To hold that coverage existed in such a case would mean that such a tortfeasor could purchase coverage a day before the injured person was acquitted in the criminal proceeding and thus shift the burden of damages to an unwary insurance company.").

**2.**

We are not entirely convinced by the first argument. Under Pennsylvania law, favorable termination is an essential element of the tort of malicious prosecution.  Cap v. K-Mart Discount Stores, Inc., 515 A.2d 52, 53 (Pa. Super. 1986).  There appears to be no basis in Pennsylvania law for holding the element of favorable termination a mere precondition to suit, or for treating favorable determination as "less essential" to the tort than the remaining elements.  For that reason, the argument that the "essence" of the tort requires adoption of the majority

10

rule is not compelling.  See Roess, 383 F. Supp. at 1235

(rejecting majority rule; "There is nothing in the Florida cases

to indicate that one element is the 'essence' of the tort, or

might be otherwise regarded as more important than another

element.").

The concerns about "the unwary insurer" are well-

founded.  Malicious prosecution is an intentional tort -- the

plaintiff must prove malice in order to prevail.  As a

theoretical matter, of course, a municipality that intends

maliciously to bring criminal charges against a person may shift

the burden of liability to an unwary insurance company even under

the majority rule, by purchasing an occurrence policy the day

before charges are filed. See Roess, 383 F. Supp. at 1235.

Notwithstanding this observation, we believe it is more likely

that an unscrupulous insured would purchase insurance after

rather than before the initiation of a questionable prosecution.

 This counsels adoption of the majority rule.

### 3.

At the same time, we do not find convincing the

principal argument cited in support of the minority rule.  Under

the minority rule, there is a confluence between the date on

which the tort occurs for insurance purposes and the date on

which the statute of limitation begins to run.  See Cap v. K-Mart

Discount Stores, Inc., 515 A.2d 52 (Pa. Super. 1986) (statute of

limitation begins to run on tort of malicious prosecution at time

of favorable determination of underlying proceedings, when claim

arises).  But these dates need not necessarily correspond.

11

Reliance on the commencement of the statute of limitation is not dispositive in determining when a tort occurs for insurance purposes. Statutes of limitation and triggering dates for insurance purposes serve distinct functions and reflect different policy concerns. Statutes of limitation function to expedite litigation and discourage stale claims. Bigansky v. Thomas Jefferson University Hosp., 658 A.2d 423, 426 (Pa. Super. 1995). But when determining when a tort occurs for insurance purposes, courts have generally sought to protect the reasonable expectations of the parties to the insurance contract. Appalachian Ins. Co. v. Liberty Mut. Ins. Co., 676 F.2d 56 (3d Cir. 1982).

Because of this fundamental difference in purpose, courts have consistently rejected the idea they are bound by the statutes of limitation when seeking to determine when a tort occurs for insurance purposes. See ACandS, Inc. v. Aetna Cas. and Sur. Co., 764 F.2d 968, 972 (3d Cir. 1985) (statute of limitation cases "are not particularly relevant" to determining what event triggers insurance coverage); Keene Corp. v. Ins. Co. of North America, 667 F.2d 1034, 1043-44 (D.C. Cir. 1981) (statute of limitation cases "are not at all relevant" and "have no bearing" in case seeking to determine when tort occurred for insurance purposes); Insurance Co. of North America v. Forty-Eight Insulations, Inc., 633 F.2d 1212, 1220 (6th Cir. 1980) (because of differences in underlying policies, statute of limitation cases not relevant to determining when asbestos-related tort occurs for insurance purposes); Commercial Union

12

<u>Assurance Co. v. Zurich American Ins. Co.</u>, 471 F. Supp. 1011, 1015 (S.D. Ala. 1979) ("cases dealing with the determination of the date or occurrence of a continuing injury or disease for the purpose of applying appropriate statute of limitations are not controlling for purposes of determining insurance coverage"); <u>Southern Maryland Agric. Ass'n v. Bituminous Cas. Corp.</u>, 539 F. Supp. 1295, 1302-03 (D. Md. 1982) (date on which statute of limitation begins to run not determinative of date when tort of malicious prosecution occurs); <u>S. Freedman & Sons v. Hartford Fire Ins. Co.</u>, 396 A.2d 195, 198-99 (D.C. 1978) (statute of limitation "provides little assistance" and "need not determine" when tort of malicious prosecution occurs). For this reason, we do not believe the date on which the statute of limitation begins to run on malicious prosecution claims should determine when the tort occurs for insurance coverage purposes.

**4.**

Except for the need to protect the unwary insurer, none of the arguments cited in the extensive case law appear to provide compelling reasons in favor of either the majority or minority rule. As we have noted, we believe the unwary insurer rule is supported by strong policy considerations. But of greater significance, we believe that principles of Pennsylvania insurance law, which determine when a tort occurs for insurance purposes, argue strongly in favor of the majority position.

**C.**

The law of Pennsylvania on the timing of the "occurrence" of a tort for insurance purposes is rooted in the

13

decision of our court in Appalachian Ins. Co. v. Liberty Mut. Ins. Co., 676 F.2d 56, (3d Cir. 1982). In Appalachian, we were asked to decide a question of first impression under Massachusetts law -- when, for the purpose of determining liability under an occurrence-based insurance policy, the tort of employment discrimination occurs. We held "the determination of when an occurrence happens must be made by reference to the time when the injurious effects of the occurrence took place." Id. at 61-62. We based our decision on our belief that defining the timing of an occurrence with reference to the moment at which injurious effects take place would best protect the expectations of the parties entering into an occurrence-based insurance contract. We also noted this rule followed those adopted in other jurisdictions. Id. at 62, citing Keene v. Insurance Co. of North America, 667 F.2d 1034 (D.C. Cir. 1981), Eagle-Picher Indus., Inc. v. Liberty Mut. Ins. Co., 523 F. Supp. 110 (D. Mass. 1981), Deodato v. Hartford Ins. Co., 363 A.2d 361 (N.J. Super. 1976); Peerless Ins. Co. v. Clough, 193 A.2d 444 (N.H. 1963).

In many tort cases, the date on which the injurious effects manifest themselves may be easily identified. But in Appalachian we recognized the issue is more difficult with torts causing injurious effects over a period of time. With torts like ongoing employment discrimination, for example, we noted the injurious effects do not occur on a single day. This makes it more difficult for courts and for the parties to an insurance contract to determine when the tort "occurred" for insurance coverage purposes. To resolve this issue, we held in Appalachian

14

that "in this type of a case the occurrence takes place when the injuries first manifest themselves." Appalachian, 676 F.2d at 62. We believed this rule, adopted by the Court of Appeals for the First Circuit in Bartholomew v. Appalachian Ins. Co., 655 F.2d 27 (1st Cir. 1981), was required in order to prevent parties from insuring themselves for events which had already taken place or were taking place. Id. at 63. The rule solves the inherent problem in dating for insurance coverage purposes the occurrence of an ongoing tort, by defining the timing of the occurrence with reference to a single moment which is usually easy to determine — — the time at which the injurious effects first became apparent.

Appalachian involved application of Massachusetts law, but it has been followed in recent years by Pennsylvania intermediate appellate courts. In D'Auria v. Zurich Ins. Co., 507 A.2d 857 (Pa. Super. 1986), a plaintiff who developed renal failure in 1979 sued his former physician alleging that his medical problem had been caused by the physician's negligence between 1957 and 1963. The physician's insurers argued they did not have a duty to defend because the occurrence did not fall within the coverage period of the occurrence policies, from 1973 to 1982. Citing Appalachian, the Pennsylvania Superior Court ruled "[a]n occurrence happens when the injurious effects of the negligent act first manifest themselves in a way that would put a reasonable person on notice of injury." Id. at 861. The court held the renal failure was apparent and first manifested itself in 1963, the tort therefore "occurred" for insurance coverage purposes in that year, and the insurance companies did not have a

15

duty to defend.  Id. at 862.  This approach was followed two years later in Keystone Automated Equipment v. Reliance Ins. Co., 535 A.2d 648, 651 (Pa. Super. 1988).  Thus, under D'Auria and Keystone, a tort occurs for insurance purposes under Pennsylvania law at the time when the injuries caused by the tort first manifest themselves.

Citing Keystone, D'Auria, and Appalachian, the district court predicted the Pennsylvania Supreme Court would hold the tort of malicious prosecution occurs for insurance coverage purposes at the time charges are filed, because this is the first moment the injuries manifest themselves and when a reasonable plaintiff would become aware of his injuries.  Erie, 935 F. Supp. at 614-16.  We agree.  Although a legal claim for malicious prosecution does not arise in Pennsylvania until the underlying charges are dismissed or at acquittal, the injuries caused by the tort -- incarceration, humiliation, suspense, physical hardship, and legal expenses -- first manifest themselves and become evident to a reasonable plaintiff at the time of arrest and filing of charges.  Therefore, we hold that the tort of malicious prosecution occurs for insurance purposes at the time the underlying charges are filed.  Because none of the insurance policies before the court were in effect at the time charges were filed against DiNicola, the district court correctly dismissed the City of Erie's action.[6]

_____

6.    As we have noted, the City of Erie could have obtained coverage against liability for DiNicola's claim had it obtained occurrence-based coverage effective at the time the underlying charges were filed against DiNicola in 1980, or by obtaining a

16

We acknowledge the tort of malicious prosecution is unusual. Unlike the more commonplace torts involved in Appalachian, D'Auria, and Keystone, the tort of malicious prosecution remains legally incomplete until favorable termination of the criminal proceeding, an event which may take place years after the initial injury has manifested itself. Nevertheless, we see no indication the Pennsylvania Supreme Court would abandon the first manifestation rule in this case. Absent some support in Pennsylvania case law, we are hesitant to take such a step. We also note that our alignment with the majority position assists in the development of a uniform national rule, an important consideration in view of the interstate nature of insurance.

(..continued)
"claims made" policy effective at the time when DiNicola filed his suit against the city in 1994.

The City of Erie argues in the alternative the insurance policies are ambiguous and should be construed against the insurance companies. We disagree. "Whether an ambiguity exists is a question of law." 12th Street Gym, Inc. v. General Star Indem. Co., 93 F.3d 1158, 1165 (3d Cir. 1996) (citing Hutchison v. Sunbeam Coal Corp., 519 A.2d 385, 390 (Pa. 1986)). Though the parties here disagree about the terms of their insurance policies, "[d]isagreement between the parties over the proper interpretation of a contract does not necessarily mean that a contract is ambiguous." Id. (citing Vogel v. Berkley, 511 A.2d 878, 881 (Pa. Super. 1986)). A contract is ambiguous only "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." Id. (quoting Steele v. Statesman Ins. Co., 607 A.2d 742, 743 (Pa. 1992)).

In this appeal, the parties agree the policies are occurrence-based and provide coverage for the tort of malicious prosecution. It is true the policies do not define precisely when the tort of malicious prosecution "occurs." Where, however, a term is not defined in an insurance policy but possesses a clear legal or common meaning that may be supplied by a court, the contract is not ambiguous. See Fidelity and Guar. Ins. Underwriters, Inc. v. Everett I. Brown Co., 25 F.3d 484 (7th Cir. 1994) (though ambiguous contracts are construed against maker and term "accident" is not defined in policy, contract not ambiguous where term has legal meaning defined by courts); Indiana Gas Co.,

Inc. v. Aetna Cas. & Sur. Co., __ F. Supp. __, 1996 WL 701051 (N.D. Ind. 1996) (failure to define term "accident" does not render contract ambiguous where term may be given legal meaning by court); Borish v. Britamco Underwriters, Inc., 869 F. Supp. 316, 319 (E.D. Pa. 1994) (failure to define terms "claim" and "notice" does not render contract ambiguous); Coakley v. Maine Bonding and Cas. Co., 618 A.2d 777, 782 (N.H. 1992) (where term is undefined in contract but has been defined by judicial decision, contract is not ambiguous); Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983) (contract not ambiguous if it can be given certain or definite legal meaning by court).

Here, the courts of Pennsylvania have provided a clear legal definition of when a tort occurs for insurance coverage purposes. Therefore, the meaning of the policies is not susceptible of reasonable dispute or differing constructions. See Triangle Publications, Inc. v. Liberty Mut. Ins. Co., 703 F. Supp. 367 (E.D. Pa. 1989) (in case seeking to determine when ongoing toxic waste spill occurs for insurance purposes, failure of policy to define when tort occurs does not render policy ambiguous, where rule defining occurrence is supplied by case law). To alter the settled rule in Pennsylvania that a tort occurs when the injuries first manifest themselves would frustrate the reasonable expectations of the parties to these contracts. Moreover, we note that though the question of when the tort of malicious prosecution occurs has been heavily litigated over four decades, no court has ever ruled that a

19

contract which fails to define precisely when the tort "occurs" for coverage purposes is ambiguous.

**E.**

Also in the alternative, the City of Erie contends the tort of malicious prosecution constitutes a continuing injury. Because, the City argues, the tort does not "occur" on a single bright-line date, we should adopt a "multiple trigger" theory to determine insurance coverage. Under a "multiple trigger" approach, an insurance company has a duty to defend and indemnify if it has issued a policy in effect at any time during the continuing tort. The multiple trigger theory has been applied in Pennsylvania in asbestosis cases. J.H. France Refractories Co. v. Allstate Ins. Co., 626 A.2d 502 (Pa. 1993); ACandS, Inc. v. Aetna Cas. and Sur. Co., 764 F.2d 968 (3d Cir. 1985) (applying Pennsylvania law). Under the City of Erie's suggested approach, liability for any tort involving ongoing injuries would be determined under a multiple trigger instead of the "first manifestation" rule.

Courts adopted the multiple trigger in latent disease cases like asbestosis because the injuries caused by exposure do not manifest themselves until a considerable time after the exposure causing the injury. See, e.g., Keene Corp. v. Insurance Co. of North America, 667 F.2d 1034, 1046 (D.C. Cir. 1981). Application of a first manifestation rule, it was feared, would allow insurance companies facing countless future claims to terminate coverage during asbestosis' long latency period. The entire burden of compensation would shift to the manufacturers

20

even though the exposure causing injury occurred during the periods of insurance coverage. See id.

In Armotek Indus., Inc. v. Employers Ins. of Wausau, 952 F.2d 756 (3d Cir. 1991) (applying Pennsylvania law), a toxic waste spill case, we declined to apply the multiple trigger to a case not involving a latent disease. We acknowledged we had applied a multiple trigger theory in ACandS, Inc. v. Aetna Cas. and Sur. Co., our asbestosis decision applying Pennsylvania law. We observed, however, that ACandS was informed by "the unique character of the problem created by the policy language in the context of diseases with long latency periods", and found there was "little if any similarity between ACandS, Inc. and the present case." Armotek, 952 F.2d at 763 (citation omitted). See also United Brass Works, Inc. v. American Guarantee and Liability Ins. Co., 819 F. Supp. 465, 470 (W.D. Pa. 1992) (applying Pennsylvania law; declining to apply multiple trigger to hazardous waste tort), aff'd, 989 F.2d 489 (3d Cir. 1993) (table). Armotek and United Brass Works suggest that a continuing injury not involving the risk of a termination of insurance coverage during a disease latency period will not warrant application of the multiple trigger to determine insurance coverage.

The risk of insurance coverage termination which justifies use of the multiple trigger in asbestosis and other latent disease cases is not present here. In malicious prosecution cases, there is no interval between arrest and injury that would allow an insurance company to terminate coverage. The

21

plaintiff faces incarceration, humiliation, and damage to reputation as soon as charges are filed. Perhaps for this reason, no federal or state court has adopted the multiple trigger theory in malicious prosecution cases. See, e.g., Ethicon, Inc. v. Aetna Cas. and Sur. Co., 688 F. Supp. 119, 127 (S.D.N.Y. 1988) (applying New Jersey law) (since the filing of charges and the manifestation of injuries are contemporaneous, the circumstances justifying application of a multiple trigger are absent).[7]

For these reasons, we do not believe the Pennsylvania Supreme Court would adopt the multiple trigger analysis to determine when, for insurance coverage purposes, the tort of malicious prosecution occurs.

## IV. Conclusion

For the reasons expressed, we predict the Pennsylvanbia Supreme Court would hold the tort of malicious prosecution occurs, for insurance purposes, on the date the underlying charges are filed. In this case, that date is March 25, 1980. Because none of the insurance companies had insurance contracts with the City of Erie on that date, none has a duty to defend and indemnify the City of Erie against DiNicola's suit. We will affirm the judgment of the district court.

---

7. The court's decision was also based in part on New Jersey precedent rejecting the multiple trigger in malicious prosecution cases.