**PEOPLES TELEPHONE COMPANY, INC., a New York corporation, Plaintiff,**

v.

**HARTFORD FIRE INSURANCE COMPANY, a Connecticut corporation, Defendant.**

**No. 96–3063–CIV.**

United States District Court, S.D. Florida.

Aug. 13, 1997.

Robert C. Gilbert, Coral Gables, FL, for Plaintiff.

W. Frank Greenleaf, Miami, FL, for Defendant.

### AMENDED ORDER *

HIGHSMITH, District Judge.

THIS CAUSE came before the Court upon Defendant Hartford Fire Insurance Company's ("Hartford") motion for final summary judgment and Plaintiff Peoples Telephone Company, Inc.'s ("Peoples") cross-motion for partial summary judgment. For the reasons stated below, the Court grants Hartford's motion and denies Peoples' cross-motion. In reaching this determination, the Court has taken into consideration Peoples' request for oral argument. Due to the thoroughness of the parties' briefs, and in light of the Court's own research, the Court finds no necessity for entertaining further argument of counsel.

### PROCEDURAL BACKGROUND

Peoples brings this diversity action against Hartford, its insurer, to recover on an employee dishonesty claim under a crime insurance policy. Peoples' claim arises from the acts of its former employee, Jude Civil. Peoples provides cellular phones for rental car fleets. Civil allegedly stole from Peoples lists containing combinations of electronic serial numbers and mobile telephone identification numbers ("ESN/MIN combinations"), which are necessary to activate and use cellular phones. Civil allegedly sold the lists to third parties, who, in turn, used the number combinations to program ("clone") other cellular phones. As a result, Peoples claims to have incurred significant charges for unauthorized telephone usage.

Peoples seeks to recover approximately $660,000 from Hartford. This amount represents usage charges billed to Peoples by its cellular telephone providers, plus deactivation/reactivation charges incurred by Peoples to disconnect the stolen numbers and install new numbers on its cellular phone inventory. Hartford denies liability based on the terms of the policy. In addition, Hartford has filed a third party complaint against Civil, asserting subrogee rights in case it is adjudged liable to Peoples. However, there has been no appearance by Civil.

In its motion, Hartford prays for a judgment, as a matter of law, that Peoples' claim is not covered by the crime insurance policy. Peoples, in turn, has moved for partial summary judgment on the issue of liability. The parties agree that the coverage issue is a purely legal question, which, in light of the undisputed material facts, may be properly resolved in the context of their cross-motions for summary judgment.

### UNDISPUTED MATERIAL FACTS

1. On or about June 15, 1993, Hartford issued a policy of insurance, bearing Policy No. DDD EQ9293, to Peoples, effective from June 15, 1993 until canceled. A true copy of the policy is part of the record, as Exhibit 1 to Peoples' complaint.

2. Jude Civil was employed by Peoples for a portion of the year 1994. During the

---

* The original order issued on June 30, 1997 and conformed on July 2, 1997 is hereby amended as follows. The sentence "Peoples did not seek or pay for such coverage" found at page 14 of said order has been substituted by the sentence "There is no evidence in this record to indicate that Peoples sought or paid for such coverage" found at pages 14–15 of this order.

time of Civil's employment at Peoples, all premiums were current on the Hartford policy.[1]

3. On or about November 2, 1994, Civil was arrested and charged with various offenses arising from the theft and sale of Peoples' lists containing the ESN/MIN combinations.

4. Following Civil's arrest, Peoples notified Hartford of a claim in connection with Civil's actions. Thereafter, on February 13, 1995, Peoples submitted a written claim to Hartford. A true copy of the claim is part of the record, as Exhibit 2 to Peoples' complaint.

5. Hartford conducted an investigation of the claim. By correspondence dated October 18, 1995, Hartford denied the claim. A true copy of Hartford's denial letter is part of the record, as Exhibit 3 to Peoples' complaint.

## DISCUSSION

Policy No. DDD EQ9293 is a crime insurance policy which includes coverage for employee dishonesty. The pertinent portions of the policy are as follows:

> *Coverage:* We will pay for loss of, and loss from damage to, Covered Property resulting directly from the Covered Cause of Loss.
>
> 1. *Covered Property:* "Money", "securities" and "property other than money and securities".
> 2. *Covered Cause of Loss:* "Employee dishonesty".

The parties agree that the lists of ESN/MIN combinations are neither money nor securities, as contemplated in the insurance contract. The policy defines property other than money and securities as "any tangible property other than money and securities that has intrinsic value". The issue before the Court is whether the lists of ESN/MIN combinations fall within the foregoing definition.

According to Black's Law Dictionary, "tangible property" is "that which may be felt or touched, and is necessarily corporeal, although it may be either real or personal". The same source defines "intrinsic" as "inter-

nal; inherent; pertaining to the essential nature of a thing". By contrast, "intangible property" is defined as follows in Black's: "As used chiefly in the law of taxation, this term means such property as has no intrinsic and marketable value, but is merely the representative or evidence of value, such as certificates of stock, bonds, promissory notes, copyrights, and franchises".

The parties have not cited, and the Court has not located, any cases addressing the precise issue presented here. There are several cases, however, that provide guidance for the Court's analysis. This being a diversity case, the Court first discusses a Florida opinion.

In *Old Republic Ins. Co. v. West Flagler Assocs., Ltd.,* 419 So.2d 1174 (Fla. 3rd DCA, 1982), the Third District Court of Appeal addressed the issue of what constitutes tangible property for purposes of an insurance policy. West Flagler Associates, Ltd. ("West Flagler"), the owner of a greyhound racetrack, had a general comprehensive liability policy issued by Old Republic Insurance, Inc. ("Old Republic"). The insurance policy provided coverage for losses occasioned by "physical injury to or destruction of tangible property." *Id.* at 1176. The property in question consisted of trifecta tickets, whose value had been diminished by the alleged issuance of bogus tickets on the part of some West Flagler employees. As a result of the scheme, gamblers collected smaller payoffs and the employees skimmed the portion of the winnings attributable to the bogus tickets. The disappointed bettors sued West Flagler and Old Republic, seeking damages for the difference in the value of the tickets if the trifecta pool had not been rigged versus the value which resulted from the presence of the bogus tickets in the pool. Old Republic declined coverage and brought an action seeking a determination that it was not obligated to defend West Flagler in the suit brought by the bettors. The trial court ruled that Old Republic had a duty to defend. The Third District Court of Appeal reversed. In

---

1. Although Hartford has declined to stipulate that the policy was in full force and effect in 1994, the Court will assume this to be the case for purposes of the cross-motions for summary judgment.

reaching this determination, the court reasoned as follows:

> The [bettors'] complaints were devoid of any allegation that anything West Flagler did injured or destroyed the trifecta tickets, the only "tangible property" at issue. Only the tickets' economic value, i.e., an intangible, was alleged to have been diminished. Old Republic never undertook to insure West Flagler for its liability for intangible or economic losses. Therefore, the bettors' complaints, which plainly sought to recover for intangible losses, do not satisfy the definition of property damage in the instant policy and do not invoke the insure's duty to defend.

*Id.* at 1178. Like the trifecta tickets in *West Flagler*, the only "tangible property" at issue here is the lists of ESN/MIN combinations. Like West Flagler, Peoples seeks damages which are solely derived from the economic value of the tangible property. This Court agrees with the Third District Court of Appeal that this economic value is an "intangible".

Turning to case law from other state jurisdictions, courts in Montana and Minnesota also have confronted similar issues. In *Graber v. State Farm Fire & Cas. Co.*, 244 Mont. 265, 797 P.2d 214 (1990), the Supreme Court of Montana addressed a publishing company's claim against its insurer for defense costs and damages incurred to settle a plagiarism action brought by a competing publication. In the underlying action, the publisher of The Milepost asserted that portions of it had been copied in Graber's publication, Travel Guide. The complaint asserted that, as a result of the plagiarism, The Milepost had sustained loss of advertising business, substantial loss of revenues, irreparable injury to its reputation and good will. The insurance policy in question provided coverage for "physical injury to or destruction of tangible property" and "loss of use of tangible property". *Id.* at 216. While acknowledging that "the publication The Milepost is clearly a piece of tangible property," the court noted that the publication had not been physically injured or destroyed. *Id.* Therefore, coverage, if any, would have to come under the "loss of use" clause. Finding that the alleged losses were purely economic, and observing that "Montana courts have consis-

tently held that in order for economic loss to be covered by insurance a direct physical injury to tangible property must occur," the *Graber* court concluded that the policy afforded no coverage, and that the insurer had no duty to defend. *Id.* at 216–17. Thus, the Supreme Court of Montana appears to have reached the same conclusion as Florida's Third District Court of Appeal with regard to economic losses claimed in connection with tangible property.

Two cases from Minnesota, *Retail Systems, Inc. v. CNA Ins. Cos.*, 469 N.W.2d 735 (Minn.Ct.App.1991) and *St. Paul Fire & Marine Ins. Co. v. National Computer Systems, Inc.*, 490 N.W.2d 626 (Minn.Ct.App.1992), have been fully discussed by Peoples and Hartford. In *Retail Systems*, the appellate court was asked to construe a clause providing coverage for "physical injury or destruction of tangible property" with respect to the loss of a computer tape containing voter preference data. Finding no guidance from other courts, the *Retail Systems* court reasoned as follows:

> At best, the policy's requirement that only tangible property is covered is ambiguous. Thus this term must be construed in favor of the insured. Other considerations also support the conclusion that the computer tape and data are tangible property under this policy. The data on the tape was of permanent value and was integrated completely with the physical property of the tape. Like a motion picture, where the information and the celluloid medium are integrated, so too were the tape and data integrated at the moment the tape was lost.

*Id.* at 737.

One year later, in *National Computer Systems*, the same court was confronted with a similar question regarding damage to "tangible property", this time with respect to a set of three-ring binders containing proprietary technical and pricing information belonging to Boeing. The information was allegedly misappropriated by former Boeing employees who went to work for rival National Computer Systems ("NCS"). Boeing sued NCS, claiming that NCS had used the misappropriated information to outbid Boeing in a

competitive government contract. After NCS settled the underlying action, its insurer, St. Paul Fire & Marine, sought a declaratory judgment that there was no coverage and no duty to defend NCS under the policy. The court concluded that the misappropriation of confidential proprietary information did not constitute property damage within the meaning of the policy, but that the insurer owed NCS a duty to defend it in the Boeing action. In reaching this determination, the court distinguished *Retail Systems* as follows:

> In Retail Sys., both the information and the medium on which the information was stored were lost. In the present case, there is no allegation that Boeing's information was lost, nor was Boeing's complaint in the underlying litigation based on the loss of the medium (three-ring binders) which contained the information. Boeing also did not claim loss of use of the information.

*Id.* at 631. After citing the dictionary definition of "tangible" the court continued its analysis as follows:

> Boeing's claims against NCS alleged that NCS misappropriated Boeing proprietary information. Boeing was not suing NCS for [the employee's] misappropriation of the binders in which Boeing's information was kept; Boeing was suing NCS for taking information that gave NCS a competitive advantage over Boeing. Boeing had sought to keep the information in the binders confidential; it was the loss of the confidential nature of the information that led to Boeing's damages, not the loss of the binders containing the information. [The employee's] actions did not make the information unusable; they only deprived Boeing of the exclusive use of the information.
>
> The information was in tangible form; it was put on paper. However, the information itself was not tangible. Therefore, we

conclude the Boeing complaint did not allege damage to tangible property covered under St. Paul Fire's policy.

*Id.*

The present case resembles *National Computer Systems* rather than *Retail Systems*. Peoples' lists of ESN/MIN combinations is more like Boeing's binders containing proprietary information than the computer tape in *Retail Systems*. Also, Peoples' lists, like Boeing's binders, were misappropriated, not lost. The damages claimed by Peoples, like those claimed by Boeing, arose from the disclosure of confidential information. Moreover, the court in *Retail Systems* based its decision, in part, on a perceived, yet unexplained, ambiguity in the use of the term "tangible property". Given the clear dictionary definition of the term, and its consistent usage in general comprehensive liability policies, there appears to be no basis for characterizing it as ambiguous. Moreover, the Hartford policy goes a step further in its definition of covered tangible property, by adding the qualifier "that has intrinsic value". Peoples' lists of ESN/MIN combinations cannot be said to have intrinsic value since, without reference to cellular phones, they have no meaning or use. Therefore, this Court concludes that the Minnesota Court of Appeals' analysis in *National Computer Systems*, rather than that in *Retail Systems*, is applicable to this case.[2]

Finally, the Court discusses two cases from federal courts, which also provide interesting perspectives of the issue at hand. In *State Farm Fire and Cas. Ins. Co. v. White*, 777 F.Supp. 952 (N.D.Ga.1991), the court addressed the question of whether architectural plans constituted "tangible property" under an insurance policy which covered the now familiar "physical injury to or destruction of tangible property" and "loss of use of tangible property". State Farm had brought a

---

**2.** A third case from Minnesota, which involved computer data, *Magnetic Data, Inc. v. St. Paul Fire & Marine Ins. Co.*, 430 N.W.2d 483 (Minn. Ct.App.1988) is irrelevant because the question of what constitutes tangible property was not resolved. In determining that the accidental erasure of data from computer disks was a covered loss, the *Magnetic Data* court expressly bypassed the question of whether the magnetically encoded computer data was or was not tangible prop-

erty. Moreover, the lower court's decision in favor of coverage was reversed by the Supreme Court of Minnesota in *Magnetic Data, Inc. v. St. Paul Fire & Marine Ins. Co.*, 442 N.W.2d 153 (Minn.1989). In explaining its reasons for reversal, the high court explicitly stated that the determination of whether the computer information was intangible or tangible property was not necessary for its decision. *Id.* at 156.

declaratory judgment action against White, two other individuals, and their various business entities, seeking a judicial determination that State Farm's policy did not provide coverage to the defendants in a companion case, pending in the same court. In the underlying case, the alleged owners of the architectural plans at issue claimed that White and the others had improperly taken and used the plans to build several apartment complexes. After reviewing the legal definition of "tangible property", the *White* court determined that "an architectural plan, in its physical form, is obviously tangible, its finite mass lending weight and sensory perception." *Id.* at 954. Therefore, the court concluded, as a matter of law, that the policy provided coverage for the plans in the sense of their being printed on paper. However, the court reserved on the issue of "the value of the paper printed plan vis a vis the concept reproduced on the paper" as a factual question. *Id.* at 955. Unlike the state courts in Florida, Montana and Minnesota, the *White* court appears to have avoided the real issue before it, by converting the legal question of coverage into a factual question of valuation. It is obvious that, like West Flagler's trifecta tickets in *West Flagler,* The Milepost travel publication in *Graber,* the computer tape in *Retail Systems* and the three-ring binders of proprietary information in *National Computer Systems,* the architectural plans in *White* derive no value from their tangible aspects. It is the intangible value and/or information contained in them that prompts the insured to make a claim. Therefore, this Court will not adopt the *White* court's strategy of making a distinction without a difference.

A sounder approach to the "tangible property" question is found in *Lucker Mfg. v. Home Ins. Co.,* 23 F.3d 808 (3d Cir.1994). In *Lucker,* the Third Circuit Court of Appeals addressed the closely related question of whether the design for an anchoring system used in off-shore drilling (referred to as Lateral Mooring System, or "LMS") constituted "tangible property" within the meaning of a comprehensive general liability insurance policy, which provided coverage for "loss of use of tangible property." *Id.* at 810–11. The Third Circuit started its analysis by considering the definition of tangible versus intangi-

ble property, as articulated in various cases. The court then summarized the parties' respective positions:

> Lucker does not argue that the concept of the LMS is tangible property, for such an idea cannot be touched and is not materially existent. Rather, Lucker contends that a design which is reduced to a tangible medium, like a blueprint or a computer disk, should be considered tangible property. The Home, on the other hand, argues that where the real value of a design is in the idea, not in the physical plans that memorialize it, any loss in value of the design represents a loss in the value of the idea, which is not a loss of use of tangible property.

*Id.* at 819. The Third Circuit concluded that Home's position was the one best supported by the relevant case law. The Third Circuit's rationale in determinating that coverage for tangible property did not extend to the LMS design, is equally applicable to the question of whether such coverage is afforded to Peoples' lists of ESN/MIN combinations. In the case of the design, its real value is derived from the idea it represents. In other words, the design is a set of instructions which has no value other than as a guide to construct a device. In the case of Peoples' lists, their real value is derived from the enabling ability they possess when programmed into cellular phones. Absent such extrinsic meaning, the lists are nothing more than random sets of numbers.

In reaching its conclusion, the Third Circuit also articulated *policy considerations* with regard to insurance coverage for tangible, but not for intangible, property, which this Court finds instructive. After reciting the definitions found in Black's Law Dictionary for these terms (which definitions have been reproduced earlier in this opinion), the Third Circuit theorized:

> Insurance companies reasonably might want to exclude coverage for damage to such intangibles interests because estimating the potential liability for purposes of setting the premium might be very difficult, or even if the premium could be calculated, insuring against such liability might expose the company to such increased

costs because of a great variance in liability that a CGL [comprehensive general liability] policy might become prohibitively expensive. It may also be that insurance companies are in no better position to insure against such losses than the insured. For example, assuming that the stock is publicly traded, one can insure against changes in market price by purchasing options.

We note, however, that it is difficult to explain why liability for copyright or patent infringement would be included among the interests not covered by a CGL policy. There is no obviously increased moral hazard problem (an insufficient incentive to be careful) with respect to copyright or patent infringement as compared to other types of injuries. Nor does it appear to raise the possibility of huge liability, or liability that is difficult to calculate. And it does not appear that the marketplace provides an efficient alternative to an insurance policy as it does with things like stocks.

Perhaps exclusion of coverage for copyright or patent violations can be explained by the fact that the CGL policy is a standard form and most customers of such policies are not as risk averse with respect to copyright and patent violations as they are with other types of tort damages and so they do not demand coverage for such injuries. At all events, it appears sensible to presume that purchasers of liability insurance, who are more principally concerned with more conventional forms of tort damage that their product may cause a third party, reasonably would be willing to bear the risk of loss to traditionally intangible interests in exchange for lower premiums.

*Id.* at 819 n. 13.

The foregoing considerations are eminently applicable to this case. The damages arising from the theft of the ESN/MIN lists would have been difficult to quantify a priori. The unauthorized cellular phone charges claimed by Peoples as damages in this action could have been much lower or much higher than $600,000, depending, for example, on how widely the lists were distributed, how fast the cellular phones were cloned, and how soon the illegal activity was detected. In clear terms, Hartford's policy clearly excludes liability for such contingencies. There is no evidence in this record to indicate that Peoples sought or paid for such coverage. Like the Third Circuit, this Court finds no justification for disturbing the parties' respective allocations of risk. Hence, the Court concludes that the ESM/MIN lists are not tangible property within the meaning of the Hartford insurance policy.

### CONCLUSION

Based on the foregoing considerations, it is

ORDERED AND ADJUDGED as follows:

(1) Hartford's motion for final summary judgment is GRANTED. In accordance with *Fed.R.Civ.P.* 58, final judgment in favor of Hartford and against Peoples shall be entered by separate order.

(2) Peoples' cross-motion for partial summary judgment is DENIED.